IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2019

**JORREL BROWN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Franklin County**
**No. 2017-CR-221   J. Curtis Smith, Judge**

_____

**No. M2018-01405-CCA-R3-PC**

_____

The Petitioner, Jorrel Brown, appeals the Franklin County Circuit Court's denial of his petition for post-conviction relief from his three convictions of passing a forged check, Class E felonies, and resulting effective three-year sentence.  On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel and, therefore, that his guilty pleas were not knowing and voluntary.  Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Roger D. Layne, Chattanooga, Tennessee, for the appellant, Jorrel Brown.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the Petitioner and his girlfriend, Jade Bogard, forging and cashing three, two-hundred-dollar checks on three separate dates in October 2016.  In May 2017, the Franklin County Grand Jury indicted the Petitioner and Ms. Bogard for forgery in counts one, three, and five; passing a forged instrument in counts two, four, and six; and theft of property valued $1,000 or less in count seven.  Copies of the checks, which were attached to the indictment, showed that Ms. Bogard was the payee on the check at issue in counts one and two and that the Petitioner was the payee on the two

checks at issue in counts three through six. The payor, who allegedly signed the checks, was Robert Bogard, Ms. Bogard's father.

On July 27, 2017, the Petitioner pled guilty to passing a forged instrument, a Class E felony, in counts two, four, and six. At the plea hearing, the State gave the following factual account of the crimes:

> Your Honor, we believe the proof would show that back during the time frame set out in the indictment, the check owners discovered the checks were coming in. That they believed that they had nothing to do with passing those. They called law enforcement and began investigation. Bank personnel was then called. We believe that we could show through video and still images from the banks that Mr. Brown and the co-defendant in this matter were in fact involved in passing those checks.

Pursuant to the plea agreement, the trial court sentenced the Petitioner as a Range II, multiple offender to three years for each count and ordered that the sentences be served concurrently with each other but consecutively to a previous sentence. The remaining counts were dismissed.

In December 2017, the Petitioner filed a timely pro se petition for post-conviction relief in which he alleged, in pertinent part, that his guilty pleas were involuntary because trial counsel "induced" him to plead guilty "to a crime he did not commit." Specifically, the Petitioner asserted that he was innocent of the conviction in count two because Ms. Bogard forged, signed, and cashed that particular check. The Petitioner also alleged in the pro se petition that he received the ineffective assistance of trial counsel because trial counsel failed to investigate his case properly and failed to make a thorough examination of the discovery. The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition. In the amended petition, the Petitioner alleged that trial counsel was ineffective because she failed to investigate his case adequately and present an alternative theory of the case and that she convinced him to plead guilty by advising him that he would receive an eighteen-year sentence if he went to trial. The Petitioner also alleged in the amended petition that as a result of trial counsel's ineffectiveness, his guilty pleas were not knowing, intelligent, and voluntary.

At the evidentiary hearing, trial counsel testified that she entered the private practice of law in 2001 and that she went to work for the public defender's office in 2011. At the time she was appointed to represent the Petitioner for these offenses, she already was representing him in general sessions court for separate offenses. In May 2017, trial counsel met with the Petitioner in jail and discussed the checks. The State made a plea offer, but trial counsel did not have complete discovery at that time. Specifically, trial

counsel had "all the discovery except for the videos." The discovery included photographs that had been taken at one of the banks where the Petitioner and Ms. Bogard were present.

Trial counsel testified that the Petitioner was charged with Class E felonies and was facing a sentence of four to six years for each conviction. He also was on parole for a six-year sentence with two years left to serve when he and Ms. Bogard committed the offenses and, therefore, was facing a parole violation. Trial counsel received a notice of enhanced punishment from the State and reviewed it with the Petitioner. She also reviewed the discovery materials with him, including copies of the three forged checks and the photographs. The checks belonged to Ms. Bogard's father, and trial counsel and the Petitioner discussed possible defenses. Trial counsel did not speak with Bruce Elliott, the investigating officer in the case, but his report was in the discovery materials. Trial counsel said that in June 2017, the Petitioner was found to have violated his parole and was transferred to the Tennessee Department of Correction. Trial counsel met with him in prison on July 14, 2017. Trial counsel and the Petitioner discussed the Petitioner's trial at their meetings in May and July.

Trial counsel testified that the State's first plea offer would have allowed the Petitioner to plead guilty to three counts of forgery in exchange for concurrent five-year sentences to be served consecutively to his previous six-year sentence. However, the Petitioner "was definitely thinking about going to trial" and did not accept the offer. At some point, the State offered to let the Petitioner plead guilty to three counts of forgery in exchange for concurrent three-year sentences to be served consecutively to the previous six-year sentence. Trial counsel told the Petitioner about the offer when she met with him in prison, but he was "still leaning" on going to trial. Trial counsel said the Petitioner did not want to plead guilty to forgery because he "didn't actually sign the document." However, he "acknowledged he was there." Trial counsel said she and the Petitioner discussed "the defenses, the possibilities of going to trial, particularly on the issue of the one that was signed [by] Jade Bogard." They also discussed "the possibilities [of] being able to win that" and the "pros and cons" of going to trial. Trial counsel asked the Petitioner if Ms. Bogard's father wrote any checks to the Petitioner, and the Petitioner said he did not know. Trial counsel told the Petitioner that "that might be difficult if you can't really explain why this gentleman wrote you a check." The Petitioner never told trial counsel, "I didn't do this." Regarding one of the checks, though, he told her, "[T]hat's not mine."

Trial counsel testified that the Petitioner was scheduled to appear in court on July 27, 2017, and that she expected his case to be set for trial. On July 27, trial counsel met with the Petitioner in the back of the courtroom. She asked the district attorney if the Petitioner could plead guilty to passing a forged instrument instead of forgery, and the

district attorney agreed. Trial counsel told the Petitioner about the State's new offer, and he decided to accept it. Trial counsel told the Petitioner "the first time" they met that if he went to trial and were convicted of all three offenses, he could be sentenced to eighteen years. Post-conviction counsel asked if trial counsel ever told the Petitioner that he definitely would receive an eighteen-year sentence, and she answered, "No. I don't ever say you're going to get this, because I don't know." Trial counsel reviewed the plea "sheet" with the Petitioner, and he pled guilty that same day. The Petitioner qualified as a career offender but was sentenced as a Range II, multiple offender. Trial counsel said, "I don't think he was happy about [pleading guilty]. I felt like he just decided it was the best thing to do under the circumstances."

On cross-examination, trial counsel testified that the Petitioner "wasn't adamant" about going to trial when she talked with him about his case, and she acknowledged that he was "waffling back and forth." The Petitioner did not seem confused about the charges and did not seem confused about the two checks made payable to him, which he endorsed on the back. The third check was made payable to Ms. Bogard, and she endorsed the back of that check. Trial counsel said that the third check was "a point of contention" for the Petitioner and that they discussed the possibility he "might beat that at trial." However, even if the jury acquitted him of forging the third check, he was still facing a possible twelve-year sentence if convicted of forging the other two checks. The Petitioner had prior convictions, and trial counsel told him that his prior history could affect her ability to have him testify at trial.

Trial counsel testified that while the Petitioner's case was pending in circuit court, a misdemeanor charge for harassment was pending against him in general sessions court. He also was on supervised probation for a misdemeanor conviction in general sessions court, and a probation violation report had been filed due to the charges in this case. Trial counsel talked with the district attorney's office about the pending misdemeanor charge and the pending probation violation. The district attorney's office agreed to dismiss the misdemeanor charge and allow the Petitioner to serve his sentence of eleven months, twenty-nine days for the probation violation concurrently with his effective three-year sentence in this case. On redirect examination, trial counsel testified that she did not remember if she gave a copy of discovery to the Petitioner.

Investigator Bruce Elliott of the Decherd Police Department testified that he became involved in the Petitioner's case when Robert Bogard filed a police report about some forged checks. Mr. Bogard gave Investigator Elliott "some initial people to look at," and Investigator Elliott obtained security video from the banks involved. Investigator Elliott watched the video, which showed the Appellant and Ms. Bogard appearing to cash Mr. Bogard's checks, and he decided to charge both of them. The Appellant did not want to give a formal statement to Investigator Elliott; however, he spoke with Investigator

Elliott one time on the telephone and "came by the office once for a few minutes." The Appellant "basically said that he wasn't aware that those checks were stolen. They had borrowed money in the past from Mr. Bogard, so he assumed it was the same thing, and he just went and cashed them." Investigator Elliott never spoke with trial counsel.

On cross-examination, Investigator Elliott testified that he spoke with Ms. Bogard and that she acknowledged her involvement in forging and passing the checks. Investigator Elliott said, "Her statement was that he had as much to do with it as she did."

The thirty-six-year-old Petitioner testified that he completed the eighth or ninth grade and did not obtain his GED. He acknowledged that he pled guilty to the charges but said that he did not know the checks were forged. He explained as follows:

Well, the reason why I pleaded guilty at the time, when they came to me with the offers, we went to court, and she came to me with the offers and stuff, one offer was five years. Then she come back and it was three consecutive ones[.] . . . She had come back with three consecutive ones, and you know, I didn't really understand why it went from, you know, five to three, and you know, stuff like that, but we never -- we didn't really completely discuss everything all the time. I heard some of what she said. I understood some of what she said, but some of it I didn't.

The Petitioner was on parole when he cashed the checks, and his parole was revoked due to the charges.

The Petitioner testified that he met with trial counsel one time in jail for approximately five minutes and that he met with her one time in prison. The Petitioner said that he did not receive the discovery until the morning he signed his plea agreement and that he "didn't have time to even look at it and see what was in it." The Petitioner and Ms. Bogard had borrowed money from Mr. Bogard previously to pay bills, and Mr. Bogard wrote them a check for $700. The Petitioner thought the three checks at issue were "checks just like they had been wrote before." Post-conviction counsel asked if Mr. Bogard "hand[ed]" any of the checks to the Petitioner, and the Petitioner responded, "No, 'cause I wasn't allowed to come to his house. At the time I wasn't allowed to come to his house. I just went there with her, I [sat] in the car, and then she came back out to the car, and the check was already written in my name." The Petitioner thought Mr. Bogard was helping him and Ms. Bogard pay more bills, and he thought he could trust Ms. Bogard.

The Petitioner testified that trial counsel met with him in prison in July 2017. Trial counsel asked him about the checks, and he told her that he did not remember three checks being involved. They discussed Ms. Bogard, and trial counsel told him that if he

proceeded to trial, he would be sentenced to eighteen years. The Petitioner told trial counsel that he would rather go to trial "and see what's going to happen." The Petitioner told trial counsel several times that he did not know the checks were forged, but trial counsel told him that he "would get" eighteen years if he went to trial. Trial counsel's statement convinced the Petitioner to accept the State's three-year plea offer. The Petitioner did not want to plead guilty because he did not think he had done anything wrong. The Petitioner reiterated, "I wouldn't have pled if she hadn't told me I was going to get 18 years. That's a lot of time for something so small."

The Petitioner testified that on the morning of his guilty pleas, trial counsel told him that he was going to plead guilty to "three consecutive ones at thirty percent." She later told him that he was going to plead to "three threes [concurrent] at 35 percent." The Petitioner did not understand what she was telling him. During the plea hearing, he stood beside trial counsel at the podium. When he tried to ask her a question, she told him, "[D]o you want me to just stop this, and you just go ahead and go to trial and get 18 years[?]" The Petitioner told her, "[N]o, I was just going to ask you something."

On cross-examination, the Petitioner testified that trial counsel told him that three checks were involved and that the State had photographs and video of him passing two of the checks. The Petitioner did not know until after he pled guilty that the check at issue in count two did not have his name on it. The Petitioner denied that he and trial counsel discussed a possible defense to count two. He said that if he had seen the check related to count two before he pled guilty, he would have "protested it."

The Petitioner testified that he did not learn that the three checks had been stolen until he was charged with the offenses. The Petitioner said he did not have much experience with the court system but acknowledged having seven prior felony convictions. He said that he had never had a jury trial but that he knew "[a] little" about plea negotiations from prior guilty pleas.

The Petitioner acknowledged that during his plea hearing, the trial court advised him that he was waiving his right to a jury trial. The trial court asked him whether it was his decision to plead guilty. Before responding, the Petitioner tried to ask trial counsel a question. Trial counsel told him that he would receive an eighteen-year sentence, so he thought he had to accept the State's plea offer. The Petitioner acknowledged that he understood the charges against him but said that he did not know Ms. Bogard wrote the checks. He also acknowledged that in exchange for his guilty pleas, the State dismissed the charge pending against him in general session court and "resolved" his probation violation so that he did not have to spend any additional time in confinement.

- 6 -

Kandi Nunley testified for the State that she began practicing law in 2007 and was an assistant public defender. One of Nunley's colleagues served as the Petitioner's trial counsel. Nunley said that on July 14, 2017, she accompanied trial counsel to Bledsoe Correctional Complex "to meet with Mr. Brown, to go over his discovery, to talk about his offer and what his options were." Nunley was present for the entire meeting.

Nunley acknowledged that the Petitioner's case involved three checks. Trial counsel and the Petitioner discussed the fact that two of the checks were made payable to the Petitioner, that he appeared to have endorsed the two checks, and that the third check was made payable to Ms. Bogard. The Petitioner understood that the State's video covered only the two checks made payable to him but that he was charged with crimes involving all three checks. Trial counsel and the Petitioner talked about trial strategy, including a defense to one of the checks, and the Petitioner told trial counsel about "prior interactions" with Mr. Bogard.

The State asked Nunley if trial counsel told the Petitioner that he was going to receive an eighteen-year sentence. Nunley answered, "I don't believe so. I believe it was you could get up to 18 years at 60 percent, because of the career offender status if the judge chose to stack." She acknowledged that assistant public defenders were trained to tell defendants about the "worst case scenario" if convicted at trial and that trial counsel did so in this case. The Petitioner did not seem confused about the State's plea offer but "was not happy with the offer." Nunley said that when she and trial counsel left the meeting, she thought the Petitioner was not going to accept a plea offer and was going to trial. She did not remember if she was present at the Petitioner's guilty plea hearing.

On cross-examination, Nunley testified that she did not think trial counsel gave the Petitioner a copy of his discovery at the meeting because "Bledsoe does not allow it." On redirect examination, she acknowledged that having a defendant change his or her mind about going to trial and decide to accept a plea offer was not unusual.

In a written order, the post-conviction court denied the petition for post-conviction relief. The post-conviction court found that trial counsel "was fully aware of the allegations in all counts of this case, was fully aware of the 'discovery' materials in this case, was fully aware of a co-defendant being involved in the case, and was fully aware of the connection between the defendant and co-defendant." The post-conviction court found that trial counsel discussed the State's plea offer with the Petitioner and "the possible ramifications of proceeding to trial," which included the possibility of an eighteen-year sentence as a career offender. The post-conviction court referred to the guilty plea hearing transcript and held that the trial court's colloquy with the Petitioner complied with Boykin v. Alabama, 395 U.S. 238 (1969), and State v. Mackey, 553 S.W.2d 337 (Tenn. 1997), and that the Petitioner made a voluntary and informed decision

to plead guilty. Specifically, the trial court noted that the Petitioner stated during the hearing that he understood the charges and potential punishments, that he and trial counsel had discussed the charges, that trial counsel had discussed the guilty plea agreement with him, that he was satisfied with trial counsel's representation, that he had not been pressured to plead guilty, and that he was pleading guilty because he was guilty. Accordingly, the post-conviction court held that the Petitioner pled guilty knowingly and voluntarily and that he failed to show he received the ineffective assistance of counsel.

## II. Analysis

On appeal the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to investigate his case adequately, failed to present an alternative theory of the case, and told him that he would receive an eighteen-year sentence if he went to trial. The Petitioner also contends that as a result of trial counsel's ineffectiveness, his guilty pleas were not knowing and voluntary. The State responds that the Petitioner failed to show that trial counsel was ineffective or that the Petitioner's guilty pleas were unknowing and involuntary. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668,

687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).  Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial."  Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a guilty plea, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury.  Boykin, 395 U.S. at 243.  Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant."  North Carolina v. Alford, 400 U.S. 25, 31 (1970).  In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea and determine whether the defendant understands those consequences.  Boykin, 395 U.S. at 244.

In determining whether the petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead

- 9 -

> guilty, including a desire to avoid a greater penalty that might
> result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

Initially, we note that the State argues the Petitioner has waived his post-conviction claims regarding his convictions in counts four and six because "his petition focused solely on his claims regarding count two of the indictment." We disagree with the State. Although the Petitioner's pro se and amended petitions specifically addressed his conviction in count two, the petitions and post-conviction counsel's argument at the evidentiary hearing demonstrate that the Petitioner was challenging all three of his convictions. Therefore, we conclude that the issue has not been waived.

As to the Petitioner's claim that he received the ineffective assistance of counsel, trial counsel testified at the evidentiary hearing that the Petitioner knew the charges involved three checks, that the State had photograph and video evidence for only two of the checks, and that she and the Petitioner discussed a possible defense for the third check. Although the Petitioner testified that he did not see the discovery until the day of his pleas, trial counsel and Kandi Nunley testified that trial counsel reviewed the discovery materials with the Petitioner, discussed the problems with the evidence against him, and discussed all options. Trial counsel also stated at the hearing that she told the Petitioner he was facing an eighteen-year sentence if convicted but that she did not tell him that he definitely would receive an eighteen-year sentence. Trial counsel told the Petitioner about an effective five-year plea offer from the State, but the Petitioner wanted to go to trial at that time. She later told the Petitioner about an effective three-year offer. Both offers required guilty pleas to three counts of forgery, but the Petitioner rejected them. However, when the State agreed to allow him to plead guilty to three counts of passing a forged instrument instead of forgery, he immediately decided to accept the State's offer. Trial counsel testified that she explained the plea agreement to the Petitioner, and the post-conviction court in its findings implicitly accredited trial counsel's testimony. Accordingly, we conclude that the record supports the post-conviction court's ruling that the Petitioner has failed to demonstrate trial counsel was ineffective.

Regarding the Petitioner's claim that his pleas were not knowing and voluntary, our review of the plea hearing transcript reveals that after the State advised the trial court about the terms of the Petitioner's plea agreement, the trial court asked the Petitioner if he had any questions. The Petitioner asked the trial court if he were going to receive credit for the time he had been in jail since May 8. The State responded, "Your Honor, he's actually serving a parole violation. I can't give him credit. In fact, we have to run this sentence consecutive, because this occurred while he was on parole." The trial court

asked the Petitioner if he had any other questions for his attorney, and the Petitioner said no. The trial court advised the Petitioner about his rights to a jury trial, to confront the State's witnesses, and to remain silent. The trial court asked the Petitioner if he had discussed his case with his attorney and if he was satisfied with his attorney's representation. The Petitioner answered both questions affirmatively. At that point, the trial court was advised that the Petitioner had a question for his attorney, which he was allowed to ask. The trial court asked the Petitioner if anyone was forcing him to plead guilty and if he had been promised anything other than what was included in his plea agreement, and the Petitioner answered both questions in the negative. Finally, the trial court asked the Petitioner if trial counsel had read or explained his plea agreement forms to him, if he had signed the forms, and if he were guilty of the offenses, and the Petitioner answered yes to each question. The Petitioner never expressed any concern about trial counsel's representation or that he was pleading guilty to three counts of passing a forged instrument in exchange for an effective three-year sentence. We note that the Petitioner was facing a substantially greater punishment if convicted of even two of the offenses at trial. Thus, we conclude that the post-conviction court did not err by ruling that the Petitioner's guilty pleas were knowing and voluntary.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE